

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:NJM/LRO
F. #2018R01784

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 10, 2023

<u>By E-mail and ECF</u>

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Tawanna Hilliard
     <u>Criminal Docket No. 19-358 (S-1) (PKC)</u>

Dear Judge Chen:

   The government respectfully submits this letter in advance of the defendant Tawanna Hilliard's sentencing in the above-captioned case, which is scheduled for March 14, 2023. The defendant was convicted, following a jury trial in April 2022, on charges of witness retaliation conspiracy, witness retaliation, obstruction of justice conspiracy, and obstruction of justice. Pre-Sentence Investigation Report ("PSR") ¶¶ 1-5. For the following reasons, the government respectfully requests that the Court impose a sentence of 63 months' imprisonment.

I. <u>Background</u>

   A. <u>The 5-9 Brims</u>

   The 5-9 Brims is a Bloods-affiliated street gang, referred to as "Primetime." PSR ¶ 11, Tr. 534, 538-39.[1] The 5-9 Brims are one set of the New York Blood Brim Army, or

---

   [1] References to "Tr." refer to the pages of the trial transcript. References to "GX" refer to the government's trial exhibits, and references to "Ex." refer to exhibits that were not marked for trial but are attached hereto. For the Court's convenience, copies of all referenced exhibits, which include video files (GX 1, 3, 7A-7P, 8, 9, and 1021) and spreadsheets (GX 655 and 802), have been provided to the Court on a USB drive. Because some of the exhibits reference personally identifying information of non-parties and others reference individuals' meetings with the government, the government respectfully requests permission to file the exhibits under seal. See <u>United States v. Amodeo</u>, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (privacy interests of third parties may be compelling reason justifying sealing); <u>United States v. Doe</u>, 63 F.3d 121, 128 (2d

"NYBBA," formed in approximately 1995. Tr. 534-35. The Brims used violence, including prison slashings and stabbings and, outside of prisons, shootings, to harm their enemies; they would participate in "[s]hootings, stabbings, robberies, [and] fights." Tr. 554, 546-47. They would earn money through robberies, drug trafficking, financial crimes and other unlawful activities. PSR ¶ 11; Tr. 554. This money would often flow to the leaders of the gang, and it would sometimes be used to buy instruments of the gang's trades, including "scamming tools, instrument tools, or it going to, like, guns." Tr. 554.

The 5-9 Brims had rules that members were required to follow. PSR ¶ 15; Tr. 559. The first rule is "no snitching." Id. That meant that members were not permitted to "[c]ooperat[e] with any type of law enforcement." Tr. 559. That rule was "the most important rule" for the gang. Tr. 560. When a member violated the "no-snitching" rule, "nine out of ten they probably end up dead or – or – or close to it." Tr. 562.

The 5-9 Brims also had a structure in place, including set leadership positions for senior members. PSR ¶¶ 12; Tr. 540-43. One of the senior leaders in the gang was "P-Brim," who was regarded as the "co-GF of [the] 5-9 Brims," or co-godfather of the gang. Tr. 592; see also Tr. 550-52; GX 201. Godfather was the highest position in the gang. Tr. 540. At times, a specific member of the Brims, whose identity is known to the Court ("Brim-1"), was also identified as a leader of the 5-9 Brims gang, specifically, the godmother of the gang. Tr. 570.

B.  The Defendant

At all times relevant to the case, the defendant worked as a paralegal at the United States Attorney's Office for the District of New Jersey, where she was assigned to support affirmative civil enforcement actions brought by the United States. Tr. 361. The defendant did not have any responsibilities relating to criminal cases. Tr. 363.

The defendant also shared a child—her son and co-defendant, Tyquan—with a high-ranking member of the violent 5-9 Brims gang. PSR ¶ 16. As of 2016, the defendant was still in contact with her child's father, who was a well-known member of the gang, and she spoke with him and her son about the gang's affairs. PSR ¶ 24.

C.  The Defendant's Involvement with the 5-9 Brims and Prior Gang-Related Conduct

From at least 2016 on—that is, from the earliest time the government obtained records relating to her conduct—the defendant was engaged, while at work, in helping her son to manage his ascension in the 5-9 Brims. Far from a passive observer—or from someone who "has no sympathy for gangs," see ECF Dkt. No. 87 at 9, ECF No. 149 ("Def. Mem.") at 11—the defendant actively participated in Tyquan's gang machinations on a number of occasions and in different ways.

---

Cir. 1995) (danger to person may be compelling reason to override public's right of access in courtroom closure context).

1.   The Defendant Participated in Gang Discussions on Recorded Jail Calls

First, the defendant participated in telephonic strategy sessions about the gang.  As reflected on recorded jail calls, the defendant directly advised her son about how to harm people in the gang, and how to secure support within the gang in the context of an internecine conflict.  Although sometimes the defendant listened to Tyquan rather than talking, on other occasions she injected her thoughts.

The defendant's discussions with her son included assisting him with understanding how criminal cases proceeded, specifically in the context of accusations that gang associates were snitching.  See, e.g., GX 301-T ("if he made a plea, he wouldn't get no 6…he wouldn't get no 6 years.  Not only that, he would be, it would be a fed case, still").

Recorded calls also make clear that the defendant coordinated with both Brim-1 and P-Brim on Tyquan's behalf.  GX 302-T (describing interactions with Brim-1); GX 308-T (Tyquan directing the defendant how to surreptitiously contact P-Brim using a "Get Well card or I miss you card and put the number on it").  For Brim-1, initially, the defendant was willing to assist her in her gang-related efforts.  For example, in an April 20, 2016 recorded jail call, the defendant confirmed that Brim-1 had called to see if the defendant could learn whether someone had "snitched," and, according to the defendant, stated that Tyquan had accused someone of cooperating.  GX 301-T.  The defendant stated that she had looked someone up to see if that name showed up in the documents—presumably in court filings.  Id.; see also GX 302-T (identifying as a "red flag" the fact that she could not identify people that Brim-1 had cited as federal defendants).  As the defendant conveyed on those calls, Brim-1 believed that the defendant could find out if somebody had "snitched" (i.e., provided information to law enforcement) by looking up their case using her employment database access.  The defendant reported to Tyquan, in sum and substance and in part, that if there was not a court transcript, she could not see the document, but admitted that she had looked up the names anyway, and that after she did so, Brim-1 stopped "calling [the defendant] back."  GX 302-T.

When Tyquan and Brim-1 engaged in an internecine gang dispute, the defendant weighed in on the strategy that Tyquan and his gang allies, including "Boom" and "Spazz," should use to get back at her.  See GX 302-T (advising that they wait until "Spazz" "comes through" because the other members were not "gonna do shit . . . Boom . . . Boom is respecting that fucking title of hers [i.e., her status as the godmother]").

2.   The Defendant Used Protected Systems to Query People on Behalf of the Gang

During the same period of time, the defendant was running names in both protected and unprotected systems on behalf of Tyquan and his gang co-conspirators.  In a number of calls from 2016, the defendant agreed to look up people—both at the behest of Brim-1, and then eventually, she looked up Brim-1 as part of Tyquan's plotting against Brim-1.  See GX 303-T (announcing on an April 28, 2016 call that she would look up Brim-1).

Testimony from an RELX employee established that—also on April 28, 2016—the defendant searched through public records databases for information relating to Brim-1.  GX 655;

Tr. 229, 238-39. To search in the database, the defendant had to select a "permissible purpose" under the Gramm Leach Bliley Act ("GLBA"), Tr. 231, and chose "fraud prevention." The defendant repeated her search, narrowing down her target until she was able to identify Brim-1's date of birth and ultimately her address. GX 655.[2]

The day after the defendant's searches were completed, Tyquan and the defendant again had a conversation about Brim-1 over a recorded prison telephone:

| | |
|---|---|
| Defendant : | . . . But yo, she threw you under the bus just to try to get what she wanted. Now, you know, and I'm sitting here—yo, Tyquan, tell me, I was sitting here thinking. I'm like, "Yo, this bitch is really trying to jam my son up. She really trying." And I was like, "I don't, I don't even know if I can just sit down for this one." And, and I know her name, too. Her name is [Brim-1's first name] with a Y— |
| Tyquan: | Yeah. |
| Defendant: | —[Brim-1's last name]. And she got an address in, in, in, in the 90s. That's her physical address. She only was at your [inaudible]. I don't know who [inaudible]. But that is her name. Her name is [Brim-1's first name]. You know, like, come on, now. And I know—just like y'all, I don't know if I can just sit down for that one. And I'm not like y'all. I shouldn't even be thinking like this, you know, just considering, like, the position that I'm in. You know [inaudible] fucking girl jam me the fuck up. She's a stupid bitch. She just sitting there, and she watching your face, like, she ain't doing nothing. Like, that's a dangerous chick right there. |

GX 304-T. In that exchange, the defendant expressed anger that Brim-1 "threw [Tyquan] under the bus," suggesting that the defendant needed to take action against Brim-1 ("And I was like, 'I don't, I don't even know if I can just sit down for this one.'"). The defendant also referenced information obtained through her LexisNexis query and alluded to her federal employment ("I shouldn't even be thinking like this, you know, just considering, like, the position that I'm in"). Id. In a later conversation that day, after a conversation about someone being accused of being a "rat," the defendant stated that Brim-1 was "a fucking bitch, she needs to get fucked up." GX 305-T.

---

[2]     Because the defendant exceeded her authorized access to protected computer systems when she lied in order to be able to query a protected database to access information about Brim-1, she was originally charged with exceeding her authorized access to a protected computer system. See ECF Dkt. No. 1. However, because the defendant was authorized to access the database for purposes that were consistent with her job on some occasions, in light of the Supreme Court's decision in Van Buren v. United States, 593 U.S. ---- (2021), the theory of liability for "exceeding authorized access" is no longer applicable, and the government did not pursue the charge.

The defendant also used government systems to run criminal history checks and obtain information that is not publicly available.  See GX 655, Tr. 248.  This information was beyond the scope of anything that the defendant was supposed to do in connection with her employment, Tr. 362-63, and it was directly consistent with her statements to her son indicating that she had looked people up, see, e.g., GX 301-T.   Tyquan also asked the defendant to "look up" people in handwritten notes, including some found in the defendant's apartment.  See, e.g., GX 211 ("One more person I need to you look up: [Name].  She lives near the Marine Park area. Somewhere near Kings Highway . . . Write me back when you receive this so I could get it by the end of next week.").

The defendant also used her knowledge of publicly available resources to look people up to assist her son's determinations regarding his associates' claims about where they had been incarcerated.  See, e.g., GX 301-T.

3.  The Defendant Used Department Of Justice Resources to Assist Her Son in His Gang Activities

In addition to the activities discussed at trial, the defendant also used her Department of Justice computer to assist her son in his gang activities.   For example, when the defendant's apartment was searched, law enforcement recovered paperwork, including letters from her son to other gang members.  See, e.g., GX 212.  Although the defendant continues to deny any connection to this material, see, e.g., Def. Mem. at 21-22, several pieces of evidence established a direct connection between the defendant and the gang—including correspondence with the defendant herself.  See GX 205, 207.  Additionally, the government was able to identify at least one letter from the defendant's U.S. Attorney's Office computer that is a substantively identical, typed version of a handwritten letter found at the defendant's apartment.  See GX 2002.[3]  In the letter, the defendant typed a note from Tyquan to a senior member of the gang.  The defendant's letter included a reference to the fact that Tyquan "spoke to Rexo recently."  Id.  Rexo "was the big homey of all the boroughs," or the "godfather" of the gang outside of prison.  Tr. 566.  The letter also vouched for the loyalty of Brim-1 and provided Brim-1's telephone number.  GX 2002. In the letter, the defendant, on behalf of Tyquan, wrote that "the entire Flatbush is running behind me and I'm running behind you," noting that "the Flatbush Komrads," a reference to gang members in the Brooklyn neighborhood, knew the "signature."  The beginnings of the two letters are below:

---

[3]       GX 2002 and 2003 were not offered at trial but were produced to the defendant in discovery on July 8, 2020, as part of the materials provided by the defendant's employer.

Greetings Beloved, First and Foremost. I send my unconditional
love to you and I Hope you in the right state of mind when
You recieve this kite. MY apology to not respondary Back to
You asap. Me and Angel4 Davis has Been going through
it for these pass couple of weeks. She received Your
letter. But she's acting funny to the point where she
dont want to send me the kite. With that Being
Said, I ~~Head~~ ~~what was said in the kite though~~.  It
was definitely good to hear from you Big Bro. Its
aBout to Be that time fo you to get up out of green
st. My apologies on talking like that through the I nine.
I'm definitely going to Be more careful. However I recently
spoke to Rexo and he told me when you came to see ~~Real~~
You, you told him that I never sent you a kite and
You dont know who I am (TK). This is loon son, But

Greeting Beloved,

First and foremost, I send my unconditional love to you and I hope you are in the right state of mind when you receive this kite. My apologies to you for not responding promptly. Angela Davis and me have been going through it for the past couple of weeks. She received your kite but don't want to pass it to me. However, I know what was said in the kite.

It is definitely good to hear from you, Big Bro! It's almost that time for you to get out of Green St... My apologies for talking reckless through the I-nine, I will definitely be more careful. However, I spoke to Rexo recently he told me he went to see you and you told him I never sent the kite and you don't know who I am (TK). This is Loon's son, but I don't run around telling everybody that because I'm not living on my

6

In another letter recovered from the defendant's Department of Justice computer, she wrote to Tyquan about her communications with Brim-1, including her arguments about whether Brim-1 had adequately supported Tyquan and sent him packages while he was incarcerated. GX 2003. The defendant told Tyquan that she told Brim-1 "she can't possibly have love for you when she is trying to sabotage your name and assassinate your character." Id. She then complained that Brim-1 had caused Tyquan's girlfriend to complain to Tyquan's father about the defendant.

> ### D. The 2018 Monticello Robbery and Post-Arrest Statements

The defendant was equally quick to assist her son when he was arrested in connection with a violent robbery pattern in 2018. Tyquan and John Doe agreed to, and did, rob a cellular telephone store on May 11, 2018. PSR ¶¶ 26-27. Tyquan, John Doe and Jane Doe—John Doe's girlfriend—drove to Monticello, New York, where Tyquan and John Doe intended to commit a robbery of a cellular telephone store. Id. In Monticello, Tyquan and John Doe used a BB gun to scare the employees and customers of the store, forced them into a room and bound their arms. PSR ¶ 27. They sped away, driven by Tyquan at speeds of over 125 miles per hour, until they were ultimately caught. Id.

John Doe and Jane Doe separately made videotaped, Mirandized post-arrest statements describing their roles in the robbery. PSR ¶ 28; GX 7A-7P; GX 8-9. John Doe also admitted his role in the robbery, a broader robbery pattern, and the 5-9 Brims gang, as to which he also implicated Tyquan and others. Id.; GX 7A-7P. Jane Doe made multiple admissions during her videotaped statement, including admitting her presence in the getaway car and stating that Tyquan and John Doe committed the robbery.

During both interviews, Bureau of Alcohol, Tobacco, Firearms and Explosives Task Force Officer William Puskas was present and announced on video that he was there as part of a federal investigation into the Hobbs Act robbery conspiracy, of which the May 3 and May 11 robberies were a part. GX 1, GX 3 ("I work in a federal task force, just wanted to introduce myself, just to let you know we're doing a long term investigation.").

Ultimately, Tyquan and John Doe were charged with the robbery in state court, and Jane Doe was released. Tyquan asked John Doe to sign false affidavits exculpating Tyquan for the robberies, which John Doe signed. After a time, though, Tyquan began to suspect that John Doe was cooperating with law enforcement. John Doe began to fear that he would be harmed for implicating Tyquan, so he sought to generate uncertainty by making it appear as if Tyquan had been cooperating. To that end, John Doe altered paperwork relating to his own statements to law enforcement to make it appear as though Tyquan had made the statements. John Doe showed the paperwork to two inmates at the Sullivan County Jail in order to make Tyquan's accusations against him less credible. Later, during an encounter in the jail yard, Tyquan told other inmates

that John Doe was cooperating with law enforcement.  John Doe stated that it was Tyquan who was cooperating.[4]

### E.   The Defendant's Efforts to Obtain the Videos

Tyquan and his mother frequently discussed the possibility that Jane Doe was cooperating against him.  See, e.g., GX 401-T, 402-T, 404-T, 405-T.[5]  In June 2018, Tyquan determined that John Doe had "switched lanes," i.e., that he was cooperating against Tyquan.  GX 410-T.  The defendant and Tyquan discussed John Doe's motives for cooperating, and the defendant acknowledged that John Doe "copped from the beginning . . . To release his girlfriend." GX 411-T.

When Tyquan confirmed that John Doe had made a statement to the authorities, he concluded that he was going to do a long prison term, telling the defendant "I'm gonna have to do some time though, Ma," because "N**** told, man."  GX 412-T.  Tyquan clarified that he did not have a copy of the statement at that point, however.  Id.  That call took place the same day that Tyquan's state attorney received John Doe's statements in discovery.  GX 244.

Later that same day, Tyquan called another associate and said that things relating to his case were "looking ugly" because "[t]hat n**** told."  Tyquan announced that his plan was to "get all that shit and . . . push that shit out," i.e., get copies of the videotaped statement and publish it.  He further told the associate that if she saw "Shorty"—a reference to Jane Doe—"[J]ust tell her, like, 'Yo, we got everything.  Y'all know what y'all did.  We got everything.'"  GX 414-T.

Immediately, Tyquan told the defendant that he wanted "that tape" of John Doe's statements.  GX 413-T; see also GX 417-T (directing the defendant to demand the discs of the videos from Tyquan's lawyer); GX 418-T (same).  Tyquan began directing the defendant to "tell [E] what this dude [John Doe] did," i.e., to begin rallying the gang troops against John Doe.  GX 416-T.  He told third parties that he would "have my mom send you that shit, though, of son switching lanes and all that, . . . whenever she get that shit." GX 421-T.  Tyquan told the defendant that he wanted to start "exposing n*****s," referencing John Doe and Jane Doe and describing their "ratting."  GX 423-T.  On July 26, 2018, the defendant advised Tyquan that she "got everything" from Tyquan's lawyer—because she "told him [she] want[ed] copies of it"—and

---

[4]    For the defendant to argue, as she has repeatedly, see, e.g., Def. Mem. 22-23, that she posted the videos because she was concerned that John Doe's statements might lead to physical violence against her son, defies logic and credulity.  Had the defendant genuinely been afraid for her son's safety, she could have sought assistance from law enforcement—from the United States Attorney's Office  where she worked, for example.  Instead, she took measures to conceal her identity, exposing John Doe from a gang-related email address created that day.  The defendant's own words captured on recorded jail calls, along with the title of the video she posted— NYC Brim Gang Member SNITCHING! Pt. 1—betray her true motivation.

[5]    A summary chart detailing the relevant portions of these calls is attached as GX 1312.

pledged that she would "definitely look at this stuff." GX 424-T. In later describing how much John Doe had stated on the recorded videos, the defendant noted it was "4 hours or something . . . I can't say nothing . . . Over this line? No. He's disgusting," before continuing to note that she would have to talk "face to face" because "I don't even wanna try to speak, you know . . . cryptically in a code . . . I don't have time for no coding crap." GX 429-T. Thereafter, on August 4, 2018, Tyquan told the defendant that he wanted the videos "out. I want that out there tonight." The defendant responded that she did not know, but she could "holla at Boom [to] come through, Little E," and other gang associates. GX 433-T. Tyquan directed the defendant that the videos of John Doe's statement "gotta get pushed out ASAP. Id.

The next day, the defendant and Tyquan discussed the videos on a recorded jail call. GX 434-T. Tyquan asked the defendant to upload one of the videos, and the two discussed possible titles. During the same call, Tyquan also spoke to another one of his associates and referred to the videos as "ammunition." On August 5, 2018, the video of John Doe's statement was uploaded to YouTube, by the user of a Google account with username primetime59brim@gmail.com on Gmail and "PRIMETIME 59 BRIM" on YouTube. GX 707. The video was entitled, "NYC Brim Gang Member SNITCHING! Pt. 1."

Also on August 5, 2018, Tyquan asked the defendant to send the video of Jane Doe's post-arrest statement to an associate. GX 435-T. Tyquan and the defendant also discussed "tagging" John Doe in the video, to make it clear he had also "snitched." Later that day, a different user uploaded the video of Jane Doe's statement to YouTube with the title, "NYC Brim Gang Member Girlfriend SNITCHING ([Facebook name of John Doe])." The video of John Doe's statement quickly garnered over 10,000 views, and a substantial amount of attention on social media. See, e.g., Ex. 2 (discussion of the videos including a user who tagged Jane Doe and another who wrote "All [rat emoji] must die"); Ex. 3 (comment targeting Jane Doe, referencing John Doe, in which the user wrote "he ain't snitch for you he snitched for himself YOU AND HIM IS GONNA DIE," and "he's gonna get RIPPEDDDD in jail").

F.   The Defendant Posted the Videos

The evidence at trial showed conclusively that the defendant uploaded the 30-minute clip of John Doe's post-arrest statement to YouTube with the title "NYC Brim Gang Member SNITCHING! Pt. 1."[6] First, the video was uploaded by a user with the username "Primetime 59 Brim." GX 707. That user signed up for YouTube on August 5, 2018—the same date the video was uploaded. GX 702. That user also used the IP Address 69.125.144.207 to log in and to upload the video, id.—an IP address that belonged to the defendant's home internet network, GX 554, 556. The defendant's computer logged into the primetime59brim@gmail.com account. GX 1012. The other accounts to log in around the same time belonged to the defendant and her son, who was incarcerated, but with whom she spoke regularly. GX 701, 703, 802. And, consistent with the testimony of Federal Bureau of

---

[6]   The defendant inaccurately contends that the "only evidence" connecting her to the John Doe video "is that someone used her IP address and laptop." Def. Mem. at 23.

Investigation ("FBI") Special Agent Richard Busick, the defendant's phone—and thus the defendant—were located in the vicinity of her apartment at the time.  GX 507.

Moreover, the videos and other related files were stored on the defendant's laptop. See GX 1021, 1021A, Tr. 837.  Within the defendant's laptop, they were stored within the defendant's password-protected user account.  See, e.g., GX 1021A, 1006A, Tr. 856, 1083.

And other files recovered from the defendant's laptop included emails from Google relating to the creation of the Primetime 59 Brims account, temporary search files associated with 5-9 Brims gang members identified by John Doe during his post-arrest statement, See GX 1010 at 83, 1010A, Tr. 830; and files associating "primetime59brim@gmail.com" with the defendant's name and personal email address, GX 1011, 1011A, Tr. 831.  The evidence at trial thus demonstrated that the defendant's computer, logged into the defendant's account, was used to upload videos to which the defendant had access from a computer network belonging to the defendant, all while the defendant was home, after having discussed with Tyquan the ways in which the videos would be uploaded.

The evidence similarly established that the defendant shared the video of Jane Doe with a co-conspirator.  She was directed to, by Tyquan; she contacted the co-conspirator and told her that Tyquan had something to show her; and the defendant then asked the co-conspirator for her email address and confirmed that she "got" the video.  GX 1050.  The defendant also shared Jane Doe's video publicly through Google Drive.  GX 11.

After posting the video of John Doe and assisting in the posting of Jane Doe's video, the defendant remained upset with her victims.  One month after the videos were posted, she messaged with 5-9 Brims gang member "Boom," writing that a post of Jane Doe with John Doe was making her upset.  GX 1065.[7]

### G.   The Consequences of the Defendant's Crime

The defendant's crime caused serious harm to both John Doe and Jane Doe. Although the video of John Doe's post-arrest statement was swiftly removed by YouTube, it received tens of thousands of views and numerous troubling comments.  The defendant's plan was a success: the fact of John Doe's name and cooperation were made known to violent elements of the criminal world in New York City almost immediately, and John Doe's name and social media handle became synonymous with "snitching" to violent criminals who viewed cooperation as warranting violent retribution.  See, e.g., Ex. 4 (social media post from a racketeering investigation posting unrelated to the defendant, featuring a link to the video and including the text, "Don't Be a [John Doe]," with pictures of three large rats).

Jane Doe also received numerous threats relating to her statements and heard gunshots outside her apartment, such that law enforcement agents had to relocate her to protect

---

[7]      Remarkably, the defendant argues that this post from her victim, devoid of context but dated one month after the defendant's crime, is somehow mitigating.  See Def. Mem. Ex. F at 6.

her. Id. ¶ 18. One of the people threatening Jane Doe because of her statements to law enforcement was persistent enough, and explicit enough in his threats, that he was charged and convicted of witness retaliation and interstate threats and sentenced by the Honorable Eric N. Vitaliano to 42 months' imprisonment. See United States v. Arzu, No. 18-CR-498 (ENV).[8] When he threatened to "violate" Jane Doe, he referred to her and John Doe as "FUCKING RATS."

The defendant surrendered on August 13, 2019. PSR ¶ 45. On February 23, 2022, the grand jury returned a superseding indictment adding charges of witness retaliation and witness retaliation conspiracy to the obstruction of justice, witness tampering, and witness harassment charges already pending. ECF Dkt. No. 72.[9]

II.   United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") Calculation

The parties and the United States Probation Office ("Probation") largely agree about the application of the United States Sentencing Guidelines, with three exceptions. First, the defendant objects to the PSR's determination that the dual-object conspiracy of which the defendant was convicted requires calculation of two discrete offenses: one against John Doe and one against Jane Doe. See PSR ¶ 47; U.S.S.G. § 1B1.2(d). Second, the defendant objects to the PSR's assessment that her conduct "involved causing or threatening to cause physical injury to a person, or property damage." PSR ¶ 57, U.S.S.G. § 2J1.2(b)(1)(B). Finally, the government contends that the defendant's crimes resulted in "the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2 App. Note 1.

A.   The Defendant Was Convicted of Two Objects in a Dual Object Conspiracy

The PSR properly calculated the defendant's Guidelines based on her conviction of a dual-object conspiracy. Guidelines Section 1B1.2(d) provides that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." The Guidelines note that:

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as

_____

[8]   The defendant's repeated attempts to relitigate the Arzu case have no merit. Arzu allocuted to his guilt to witness retaliation and to communicating violent threats. The defendant's arguments that Jane Doe should have been more passive in response to Arzu's direct aggression against her constitute needless victim-blaming.

[9]   The defendant's cavalier and unsubstantiated accusations about the origins of Counts One and Two in the Superseding Indictment, Def. Mem. at 5, are wrong. In any event, the defendant's latest assertion of government misconduct has no bearing on the just punishment for her serious crimes, and certainly does not constitute a "relevant consideration" for sentencing. Id.

a trier of fact, would convict the defendant of conspiring to commit
that object offense.

United States v. Robles, 562 F.3d 451, 455 (2d Cir. 2009) (per curiam) (quoting U.S.S.G. § 1B1.2 cmt. n.4). In evaluating whether to group different objects of a multi-object conspiracy, "[a] primary consideration . . . is whether the offenses involve different victims." U.S.S.G. § 3D1.2 app. n.8. If they do—even if the victims are harmed in connection with the same overall goal of the scheme—the cases would typically be treated as separate groups. Id. Here, the jury's verdict plainly found that the defendant conspired to, and did, retaliate against both John Doe and Jane Doe. See ECF Dkt. No. 122 (Verdict Form). Accordingly, there is no basis for the Guidelines not to reflect the retaliation against both victims. The defendant was on notice of the fact that this was a dual-object conspiracy, and the parties requested, and received, a special verdict form precisely to address the Robles issue.

B. The Conspirators Caused and Threatened to Cause Physical Injury

The PSR's assessment that the defendant's witness retaliation conspiracy "involved causing or threatening to cause physical injury to a person, or property damage," PSR ¶ 57, is correct. The defendant deliberately targeted her victims, knowingly using the terminology of her son's gang to alert members of the violent group that one of its own had "snitched." She posted the videos using the YouTube moniker "primetime59brim," an explicit reference to the 5-9 Brims, and she titled the video "NYC Bring Gang Member SNITCHING! Pt. 1!" PSR ¶ 35. The defendant was aware, from knowledge accumulated over many years, including dozens of gang-related conversations in 2016, that the gang violently punished people who were confirmed to be snitches. Indeed, the evidence at trial established that the most important rule of the gang was "no snitching," and that snitches were severely and violently punished. PSR ¶ 37. When the defendant's co-conspirators posted Jane Doe's video, they used a similar title but added a reference to John Doe's Facebook name, so that the 5-9 Brims watching the video would know how to identify their targets. PSR ¶¶ 35-36.[10]

The fact that the defendant caused threats and harm to be inflicted by others, rather than inflicting it herself, does not defeat the applicability of the enhancement. Indeed, pursuant to

---

[10]     The jury's verdict does not, as the defendant claims, suggest a finding "that the government failed to prove that she used threats, intimidation or harassment." Def. Mem. at 4. Indeed, during deliberations, the jury sent a note asking whether the defendant would be guilty of witness harassment (and conspiracy) if the conduct was designed to "dissuade any person from reporting [a crime]," or whether it had to be in relation "only to hindering/delaying/preventing/ dissuading SPECIFICALLY John Doe + Jane Doe." Ct. Ex. 3. The Court responded— appropriately, in light of the way that the Indictment was drafted—that the jury could convict only if the conduct was geared towards preventing John Doe or Jane Doe from providing future information to law enforcement. Tr. 1491. Shortly thereafter, the jury convicted the defendant of all of the crimes that did not require the defendant to have the intent to dissuade John Doe or Jane Doe from providing future information to law enforcement authorities—including witness retaliation conspiracy (specifically found as to both victims), witness retaliation, conspiracy to obstruct justice, and obstruction of justice.

the Guidelines, the defendant is held to account for reasonably foreseeable actions of her co-conspirators. See generally United States v. McPartland, No. 17-CR-587 (JMA), 2021 WL 3409229, at *11 (E.D.N.Y. Aug. 4, 2021) (holding defendants accountable for "the reasonably foreseeable actions of their co-conspirators" in the context of § 2J1.2"). Notably, the Eighth Circuit held that the enhancement was properly applied in a case in which a gang member "telephoned a friend and instructed her to send an email to two fellow gang members . . . giving them the 'green light' to 'smash' the witnesses[.]" United States v. Bender, 927 F.3d 1031, 1032-33 (8th Cir. 2019). Similarly, the Fifth Circuit held that the enhancement was applicable where defendant posted on social media, "If you see this guy [an informant] you already know what time it is" and "People think they can snitch on people and the[re] won't be any consequences." United States v. Trejo, 623 F. App'x 521, 522 (11th Cir. 2015). The defendant was convicted on a conspiracy theory, and her actions led to numerous reasonably foreseeable threats and attempts at violence against her victims. The enhancement is properly applied.

The defendant posted a video to YouTube of a gang member making a post-arrest statement with the title "NYC Brim Gang Member SNITCHING! Pt. 1." She used a Google account named "Primetime 59 Brim" to do it. She discussed, with her co-conspirators—her son and others—the need to "tag" one of her victims, so that people would know whom to target. And she did this while knowing that she was setting a violent gang that punished snitches on her victims. The many threats that the victims received were foreseeable to the defendant—and her family members fed the frenzy, commenting on the video, shortly after another user wrote that John Doe was "gonna get bodied [i.e., killed] cuz ain't no protection the cops gonna give him for this shit." "A Hilliard" responded:

**A Hilliard commented on your video**

   NYC Brim Gang Member SNITCHING! PT.1

   **A Hilliard**

All rats are suppose to be exposed. This guy is fucking pitiful and if he could he would tell on his own mother.

C. The Defendant's Conduct Resulted in the Unnecessary Expenditure of Substantial Government Resources

Finally, the government notes that the defendant's conduct resulted in "the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2 App. Note 1. Accordingly, a three-level enhancement for the defendant's "substantial interference with the administration of justice" pursuant to U.S.S.G. § 2J1.2(b)(2) is appropriate. But for the defendant's conduct, the government would not have had to spend substantial resources protecting John Doe (in custody) and Jane Doe (not in custody). In fact, multiple law enforcement agencies arranged for and funded temporary accommodations to ensure Jane Doe's safety after she began receiving numerous violent threats, and one individual—Carlos Arzu—pled guilty to threatening

Jane Doe in relation to her post-arrest statement. The investigation, prosecution, conviction, and three years long incarceration of Arzu unquestionably constitutes the "expenditure of substantial governmental or court resources." Cf. United States v. Roberts, 134 F. App'x 470, 472 (2d Cir. 2005) (applying the enhancement because "[t]he [d]efendant's fraud precipitated a needless bankruptcy proceeding, which lasted two and one-half years. The expenditure of court resources during that period is unquestionably substantial").

     D.  The Guidelines Calculation

In light of the above analysis, the government proposes that the Court adopt the following Guidelines calculation:

Witness Retaliation—John Doe:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2J1.2(a)): | 14 |
| Cause or Threat of Physical Injury (U.S.S.G. § 2J1.2(b)(1)(B)): | +8 |
| Substantial Interference w/ Administration of Justice (U.S.S.G. § 2J1.2(b)(2) | +3 |
| Subtotal: | 25 |

Witness Retaliation—Jane Doe:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2J1.2(a)): | 14 |
| Cause or Threat of Physical Injury (U.S.S.G. § 2J1.2(b)(1)(B)): | +8 |
| Substantial Interference w/ Administration of Justice (U.S.S.G. § 2J1.2(b)(2) | +3 |
| Subtotal: | 25 |

Multiple Count Analysis:

| | |
|---|---|
| Highest Adjusted Offense Level | 25 |
| Increase for Multiple Counts (U.S.S.G. § 3D1.4) | +2 |
| Total: | 27 |

A total offense level of 27 and a Criminal History Category of I correspond to a Guidelines range of 70 to 87 months' imprisonment.[11]

---

[11]    As noted above, the PSR did not initially include a three-level enhancement for the defendant's "substantial interference with the administration of justice" pursuant to U.S.S.G. § 2J1.2(b)(2), resulting in a total offense level of 24 and a Guidelines range of 51 to 63 months'

III.   A 63-Month Sentence Is Appropriate in This Case

      The defendant's 40-page sentencing submission seeks, in large part, to shirk accountability and relitigate the issue of her guilt—an issue that was conclusively resolved by the jury following a week-long trial.  Throughout her submission, the defendant repeatedly and emphatically refuses to accept responsibility for her actions, mischaracterizing the evidence and asserting that a below-Guidelines sentence is warranted because of the "suffering and embarrassment her arrest and conviction have caused."  See Def. Mem. at 32; see also id. at 1 n 1 (stating that the defendant "maintains her innocence"), 11 (asserting that the defendant's "fatal flaw" is her "unwavering dedication as a mother"), 21 (noting that the defendant "disputes the jury's finding").  Simply put, the victims in this case are John Doe and Jane Doe—not the defendant.  A substantial sentence is warranted to address the defendant's serious crimes, including her egregious misuse of a position of public trust, and the grave risk of harm deliberately created by her actions.

A.   The Nature and Circumstances of the Offense Are Serious

      The nature and circumstances of the defendant's participation in a gang-driven offense, aimed at undermining the administration of justice, call for a significant sentence.  As proven at trial, the defendant fulfilled a critical role in the charged conspiracies alongside her incarcerated son, serving as his eyes and ears outside of the jail and handling much of the dirty work on his behalf.  She was responsible, for instance, for seeking out John Doe and Jane Doe's videotaped statements, reviewing and reporting on their contents, and ultimately, uploading the 30-minute clip of John Doe's video to YouTube under the unmistakable headline: "NYC Brim Gang Member SNITCHING! Pt. 1."  As she hoped, the videos spread like wildfire, and the defendant and her co-conspirators celebrated; among other things, the defendant informed Tyquan that "it's all over FB [Facebook]" and had "almost 10,000" views.

      As the trial proof made clear, the defendant knew the consequences that would likely follow—particularly in light of her fluency in the gang's politics, rules and enforcement methods.  Indeed, evidence recovered from the defendant's home and computer made clear that the defendant was well-versed in the rules of the 5-9 Brims, including the first and foremost rule: "no snitching."  The defendant's home desk contained letters dating back more than a decade, discussing Tyquan's role in the gang and his willingness to "run with" its senior leaders.  Law enforcement also recovered correspondence with the defendant herself, including letters capitalizing all of the "B's" (a reference to the Bloods), letters discussing members and leaders of the 5-9 Brims, and letters—written by the defendant herself—that use express gang references (for instance, "Macs aint's Brims no more").  Recovered from the defendant's TV stand were pages of gang paperwork, including paperwork about the structure and lineups of the NYBBA, the BMW, or Brims Most Wanted, list, and the "strict and swift" discipline to be enforced by the gang.  The defendant's personal laptop similarly contained a file that listed gang oaths, sets, leaders and rivals.  The nature and scope of the defendant's involvement with the gang resolves

_____

imprisonment.  The March 8, 2023 Addendum to the PSR indicates that the "Probation Department defers to the Court's ruling at sentencing on whether or not the Government has offered enough evidence to support this enhancement."

any doubt about her awareness of the consequences that would befall John Doe and Jane Doe once their statements were exposed.  Indeed, the defendant made a handwritten note of what John Doe believed would happen if he cooperated with law enforcement:  "They're going to get me if I write statements."

Nor was the defendant's conduct a "complete aberration."  Def. Mem. at 2.  As described above, the defendant's entrenchment in the gang's business spanned many years—dating back to at least 2016 when, as established at trial, she intervened in Tyquan's gang disputes.  The defendant's belated efforts to disavow the gang are, simply put, inconsistent with the substantial evidence confirming her longstanding involvement in the gang's affairs and her willingness to take criminal action in furtherance of its interests.

### B.  A Substantial Sentence Is Necessary to Promote Respect for the Law

As set forth above and in the PSR, for more than a decade, the defendant was employed as a paralegal at the United States Attorney's Office for the District of New Jersey.  See PSR ¶ 100.  There, she was entrusted to support Assistant United States Attorneys in a wide array of responsibilities, including with court filings and discovery.  As a member of the Civil Division, the defendant was primarily responsible for supporting prosecutors in the Affirmative Civil Enforcement unit, along with handling foreign litigation cases and railroad retirement cases, among other matters.

The defendant, however, repeatedly squandered and misused her position of trust, subverting the criminal justice system in favor of the obstructionist creed of a violent street gang.  For instance, as detailed above, the evidence at trial established that the defendant used her LexisNexis account—after asking Tyquan for Brim-1's last name—to query records related to Brim-1, repeatedly searching for Brim-1's identifying information.  According to a representative from RELX, each time the defendant did so, she chose a permissible purpose in order to access protected data.  In recorded jail calls, the defendant referenced the information obtained through her LexisNexis queries, acknowledging that her "position"—i.e., her federal employment—meant that she "shouldn't even be thinking like this."  In separate calls, the defendant admitted that, at the request of Brim-1, she had looked up names of individuals believed to be federal defendants and concluded that her negative search results constituted a "red flag"—or a sign that the individuals may have "snitched."  As the defendant's supervisor confirmed, none of those tasks—including searching for criminal histories, looking up gang members, and identifying cooperating witnesses—fell within the scope of the defendant's duties at the U.S. Attorney's Office.

Material recovered from the defendant's home and from her Department of Justice computer also demonstrated the defendant's willingness to allow criminal endeavors to infiltrate her work in the federal government.  For instance, in a notebook recovered from the defendant's kitchen—which contained work-related notes from a "Civil Meeting"—the defendant took down notes regarding John Doe's post-arrest statements, including references to Tyquan as a "big hat."  Other letters from recovered from the defendant's apartment contained express requests for her to "[l]ook [an individual] up at your job and see if you could get some info on her 4 me."  The defendant's Department of Justice computer similarly contained traces of her involvement with the gang, including a typed document matching a handwritten letter, relating to the 5-9 Brims, that was recovered from the defendant's apartment.

In short, unlike many others sentenced in this District, including those who engage in crime out of desperation, the defendant had the benefit of an education and a promising career in a position of public trust.  See Def. Mem. at 9.  Though she possessed the tools to pursue a legitimate career path—and the judgment to distinguish right from wrong—the defendant instead victimized those who reported crimes to law enforcement, doing the bidding of a dangerous street gang that she knew to be violent and retributive towards so-called "snitches."  Rather than upholding the tenets of the criminal justice system, the defendant sought to undermine it—using her Department of Justice access to do so.  Her actions demonstrate a profound disrespect for the law and constitute a serious breach of public trust that warrants a serious response.

## C.  A Substantial Sentence Is Necessary to Avoid Unjust Sentencing Disparities

The Court has already imposed sentence on the defendant's co-conspirator, Tyquan Hilliard.  Because Tyquan's case resulted in a guilty plea, his Guidelines offense level was lower than the defendant's.[12]  The Court imposed a sentence of 63 months' incarceration, in large part because of the seriousness of his crime—and Tyquan, unlike the defendant, accepted that what he had done was wrong, did not seek to blame his victims, and sought to persuade the Court that he would not make a similar choice again.

The defendant, by contrast, appears capable of rationalizing any dangerous or problematic behavior away.  Her descriptions of the chain of events in the case, frequently contradicted by the evidence, include her repeated victimization by the government.  She has denied a role in posting the video that she posted or the other that she shared, and she has repeatedly asserted justifications for her criminal and dangerous behavior.  Sentencing her in the same general range as Tyquan—who held a much worse criminal history—would acknowledge both the differences in their postures and the similarities in their conduct, and would therefore be appropriate.

This defendant did not simply amplify public knowledge regarding the public testimony of a witness, as in the cases cited in the defendant's submission.  See Def. Mem. at 36-37 (citing United States v. McClain, No. 19-CR-40, 2020 WL 1503227 (W.D.N.Y. Mar. 30, 2020), and United States v. Edwards, 291 F. Supp. 3d 828 (S.D. Ohio 2017)).  This defendant, a Department of Justice employee, publicized—in terms directly relevant to the violent street gang interested in violently punishing such behavior—her victims' previously confidential, and otherwise unknown, post-arrest statement to law enforcement authorities.  She is not similarly situated to the defendants in McClain or Edwards.

Moreover, assuming that the Court applies the Guidelines as advocated by Probation (an offense level of 24, with a Criminal History Category of I, resulting in a range of 51

---

[12]     The defendant correctly notes that, in Tyquan's case, the government did not argue for the three-point enhancement for substantial interference with the administration of justice. That was error; the enhancement should have applied.

to 63 months),[13] the United States Sentencing Commission statistics for the last five fiscal years show that the median defendant sentenced in that range pursuant to Section 2J1.2 receives a sentence of 60 months' imprisonment.  See U.S. Sentencing Commission Judiciary Sentencing Information, available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard (accessed March 9, 2023).  All of the defendants received incarceratory sentences.  Courts routinely take witness retaliation cases seriously and impose meaningful prison terms.  See generally United States v. Stoker, 706 F.3d 643, 645 (5th Cir. 2013) (affirming a 108-month consecutive sentence for a defendant who mailed a witness a copy of the witness's written statement, used as evidence in an underlying case against the defendant); United States v. Smith, 230 F.3d 300, 304-05 (7th Cir. 2000) (affirming judgment of conviction when defendant received 93-month sentence in witness retaliation case in connection with a barfight).

      D.   The Defendant's Serious Crimes Caused Substantial Harm and Call for General Deterrence

Though the defendant's crimes did not result in physical injury, they deliberately generated a grave risk of violence and brutal retribution.  Responses to the videos that the defendant and her co-conspirators posted online were widespread and violent, calling for John Doe and Jane Doe to be viciously attacked:





**Lord Clarke**

3 things 1) This mafucker snitching on shit it sound like these cops don't even know about or even remotely thought was connected. 2) Shit like this is exactly why you pay niggaz when you doing dirt son sounded like he couldn't wait to give up everything he had on Chitown. 3) He still gonna get bodied cuz ain't no protection the cops gonna give him for this shit his sentence just gonna be light

REPLY   MANAGE ALL COMMENTS

---

[13]    There were an insufficient number of defendants sentenced within the range advocated by the government under Section 2J1.2, so the Commission did not report statistics for that range.



**Ayo Spazzo**
We gonna Boom uu too trust, since uu feel it's okay too snitch fuck kha & his bitch #Freetk

28m   Like   Reply



**Jesus Christ**
Damn is he even still alive ?

REPLY   MANAGE ALL COMMENTS

And the risk for John Doe and Jane Doe was not speculative—the 5-9 Brims shot and killed people for cooperating with law enforcement.  Tr. 562.  As a result of the defendant's conduct, John Doe received death threats in jail, and the FBI received credible information that his mother was at risk, requiring expenditures of significant government resources to protect John Doe's family.  PSR ¶ 38.  Similarly, Jane Doe heard gunshots outside of her apartment, prompting law enforcement to relocate her.  Ex. 1.  At least one individual was convicted of witness retaliation and interstate threats based on conduct spurred by the defendant's efforts to publicly broadcast Jane Doe's cooperation with law enforcement.  See United States v. Arzu, No. 18-CR-498 (ENV).

        The defendant's actions not only caused chaos, fear and the prospect of violence, they permanently upended the lives of her victims.  Indeed, in Jane Doe's victim impact statement (attached hereto as Exhibit 1), she writes to the defendant, "Because of your conduct I have been a victim of constant bullying on social media.  My home address was even shared on Facebook, giving anyone a target of where to go to harm me.  I can no longer associate or speak with anyone I grew up with.  I have received daily death threats."  Jane Doe further writes that she "was pregnant while [she] dealt with the retaliation caused by [the defendant's] conduct," but that she "had a miscarriage because of the extreme stress and fear caused by this conduct."  She further wrote that "life is already over and will never turn back to normal," because of how widespread the posting of her video was.

        The defendant deprived her victims of safety and security, and caused them extreme stress and trauma—effects that continue to haunt her victims to this day.  And more broadly, the defendant's conduct sent shockwaves far and wide, achieving the gang's goal of instilling fear and doubt in citizens who might now stay silent about crimes they have witnessed.  The very nature of the defendant's crimes serves to destabilize the foundation of the criminal justice system, necessitating a serious message that crimes against justice will not be tolerated.

The defendant's submission, though, does not once acknowledge the harm incurred by her victims.  To the contrary, the defendant complains that her "reputation has been smeared" and that, as a result of her arrest and conviction, the defendant has "suffered a great deal."  <u>See</u> Def. Mem. at 3.  By seeking to alternately minimize and justify her crimes, the defendant makes clear that she fails to grasp the seriousness of her conduct or the harm she has inflicted on her victims.

IV.    <u>Conclusion</u>

For the foregoing reasons, the government submits that a term of imprisonment of 63 months is necessary to ensure that the goals of sentencing have been met.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
Nicholas J. Moscow
Lindsey R. Oken
Assistant U.S. Attorneys
(718) 254-7000

cc:    Counsel for the Defendant (by ECF)
Clerk of Court (PKC) (by ECF)
U.S. Probation Officer Frank Nikolaidis